UNITED STATES of America

v.

ONE HAZARDOUS PRODUCT CON-
SISTING OF A REFUSE BIN

(owned by Mauriello Disposal located at
Hav-A-Donut, Inc.)

(owned by Mauriello Disposal located at
Foodtown Store No. 238, Inc.)

(owned by Mauriello Disposal located at
the Gateway Apts.)

(owned by Metro Disposal located at
Korvette's Tire Center)

(owned by Metro Disposal located at
State & Fayette St. Gardens, Inc.).

Civ. A. Nos. 78–2906 to 78–2908,
79–182 and 79–187.

United States District Court,
D. New Jersey.

April 9, 1980.

Robert J. Del Tufo, U. S. Atty. by Charles J. Walsh, Asst. U. S. Atty., Newark, N. J., for U.S.A.

Michael F. Riccardelli, Montclair, N. J., for claimants.

## OPINION

MEANOR, District Judge.

These five factually indistinguishable actions present for consideration a question concerning the scope of a regulation promulgated by the Consumer Product Safety Commission (the Commission) declaring certain unstable refuse bins to be "banned hazardous product[s]" under the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.*

Section 8 of the Consumer Product Safety Act, 15 U.S.C. § 2057, delegates to the Commission authority to promulgate rules declaring certain consumer products to be "banned hazardous product[s]." In order to adopt such a regulation, the Commission must find

> (1) a consumer product is being, or will be, distributed in commerce and such consumer product presents an unreasonable risk of injury; and

> (2) no feasible consumer product safety standard under this chapter would adequately protect the public from the unreasonable risk of injury associated with such product.

15 U.S.C. § 2057. In 1975 the Commission was petitioned to commence proceedings "to establish safe design criteria for the manufacture of refuse bins." 42 Fed.Reg. 30295, 30296 (June 13, 1977). After studying a series of accidents involving the tipover of metal refuse bins, the Commission compiled data which revealed that such accidents had resulted in numerous fatalities and serious injuries to children 10 years of age and under. 16 C.F.R. § 1301.3(a).[1] Based upon these findings the Commission concluded "that unreasonable risks of injury or death from crushing due to tip-over are associated with certain unstable refuse bins . . . which unreasonable risk this banning rule is designed to eliminate or reduce." *Id.*[2] Thus, the Commission promulgated a rule banning

---

1. The Commission has documented 22 fatalities, all of which involved children eight years of age and under, and 31 serious injuries, mostly to young children, resulting from accidents across the country in which a metal refuse bin tipped over crushing the victim. Affidavit of Sheila Beale (Dec. 13, 1979) and exhibits annexed thereto.

2. The remaining Findings required by § 8 of the Act, 15 U.S.C. § 2057, are contained in 16 C.F.R. § 1301.1(b) which recites, in pertinent part,

   The Commission has found that (1) these refuse bins are being, or will be distributed in commerce; (2) they present an unreasonable risk of injury; and (3) no feasible consumer

Any refuse bin of metal construction produced or distributed, for sale to, or for the personal use, consumption or enjoyment of consumers, in or around a permanent or temporary household or residence, a school, in recreation or otherwise, which is in commerce or being distributed in commerce on or after the effective date of this ban and which has an actual internal volume one cubic yard or greater and tips over when tested under [prescribed conditions and procedures].

16 C.F.R. § 1301.5(a). The effective date of this ban was June 13, 1978. 16 C.F.R. § 1301.8.[3]

In 1978, investigators employed by the Commission examined refuse bins at a number of locations in New Jersey. These inspections were intended to determine whether refuse bins then in use met the standards prescribed in the regulations. Between November 6 and December 21, 1978, a Commission investigator named Stephen Garrita examined the refuse bin in use at each of the five locations relevant to these actions. Mr. Garrita performed the tests specified in the regulations,[4] and each of the five refuse bins failed, i. e., tipped over when the force prescribed in the regulations was applied. The test results were reviewed and confirmed by a compliance officer employed by the Commission. Each of the bins was of the size and metal construction specified by the regulations.

Three of the five refuse bins examined by Mr. Garrita are owned by Mauriello Disposal, Inc., a New Jersey corporation with its principal place of business in East Orange, New Jersey. The remaining two refuse bins are owned by Metro Disposal Corporation which has its principal offices in Middlesex, New Jersey. Mauriello and Metro (collectively referred to as "Claimants") are in the solid waste disposal business. The refuse bins were placed at the locations by Mauriello and Metro as part of the service provided by the claimants to the location owners or operators. The three refuse bins owned by Mauriello were located at Hav-A-Donut, Inc., a drive-in restaurant in Orange, New Jersey (Civ. No. 78–2906), Foodtown Store No. 238, Inc., a supermarket in Orange, New Jersey (Civ. No. 78–2907) and the Gateway Apartments, an apartment complex in Nutley, New Jersey (Civ. No. 78–2908). The bins owned by Metro were located at Korvette's Tire Center, a retail business in Woodbridge, New Jersey (Civ. No. 79–182) and an apartment complex named State & Fayette St. Gardens in Perth Amboy, New Jersey (Civ. No. 79–187). In each instance, the refuse bin had been placed in the parking lot of the respective locations. The affidavits submitted by Mr. Garrita and photographs annexed thereto establish that the refuse bins were easily accessible to members of the public.

On December 5, 1978, the United States filed three of these actions, alleging that refuse bins owned by Mauriello and placed at the above locations were banned hazardous products under § 8 of the Consumer Product Safety Act, 15 U.S.C. § 2057, since the bins had failed the tests specified by the regulations promulgated pursuant to that statute. The complaints sought seizure and forfeiture of the refuse bins under § 22(b) of the Act, 15 U.S.C. § 2071(b).[5] The re-

---

product safety standard under the CPSA would adequately protect the public from the unreasonable risk of injury associated with these products.

3. The effective date was exactly one year after publication of the final version of the regulations in the Federal Register. This period was designed to permit the owners of these bins the opportunity to retrofit the refuse bins to comply with the new standards. 42 Fed.Reg. 30295, 30296 (June 13, 1977).

4. The procedures and test conditions are set forth at 16 C.F.R. §§ 1301.6 and 1301.7.

5. Section 22(b) of the Act, 15 U.S.C. § 2071(b) provides,

(b) Any consumer product—
(1) which fails to conform with an applicable consumer product safety rule, or
(2) the manufacture for sale, offering for sale, distribution in commerce, or the importation into the United States of which has been prohibited by an order in effect under section 2064(d) of this title,
when introduced into or while in commerce or while held for sale after shipment in commerce shall be liable to be proceeded against on libel of information and condemned in any district court of the United States within the

maining two actions against the refuse bins owned by Metro were instituted on January 15, 1979 and were identical in all material respects to the actions against the Mauriello-owned refuse bins.

Thereafter, Mauriello and Metro filed claims to the refuse bins and answers to the complaints in which the claimants asserted ownership and sought the return of the bins. All of the refuse bins had been seized pursuant to warrants of arrest issued by the court and have been placed in storage pending the outcome of these proceedings. The United States has now moved for summary judgment, seeking a declaration that the refuse bins are subject to condemnation and forfeiture as banned hazardous products. Claimants agree that there is no genuine issue of material fact, that the issue presented is a purely legal one and that the cases are ripe for summary judgment. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

A reading of the regulation banning certain refuse bins reveals four elements: (1) the refuse bin must have specified physical characteristics; (2) the refuse bin must fail the enumerated tests done under prescribed conditions; (3) the refuse bin must have been "produced or distributed, for sale to, or for the personal use, consumption or enjoyment of consumers, in or around a permanent or temporary household or residence, a school, in recreation or otherwise" and (4) the refuse bin must have been "in commerce or being distributed in commerce on or after the effective date of" the regulation. 16 C.F.R. § 1301.5(a).

As the above recitation demonstrates, the first two elements have been met. Claim-

ants concede that the refuse bins are of the size and metal construction specified by the regulations. Additionally, claimants do not contest the validity or accuracy of the findings made by the Commission investigator, *i. e.*, they concede that the refuse bins are not in compliance with the standards set forth in the regulations.

■ Similarly, claimants do not dispute that the third element of the ban is satisfied under the circumstances of these cases. This element tracks the statutory definition of "consumer product" contained in § 3(a)(1)(ii) of the Act, 15 U.S.C. § 2052(a)(1)(ii).[6] Of course, an article must be a "consumer product" in order to be within the regulatory authority of the Commission. The statutory definition is to be liberally construed in accordance with the stated purposes of this legislation, *i. e.*, the protection of consumers from injury due to unsafe products. *Consumer Product Safety Comm'n. v. Chance Mfg. Co.*, 441 F.Supp. 228, 231–34 (D.D.C.1977). *See* 15 U.S.C. § 2051(b). Furthermore, the enumeration of "locations and activities in which a consumer product may be used" set forth in the statutory definition and repeated in the refuse bin regulation was intended as "an assurance of comprehensiveness" rather than a limitation on jurisdiction. *ASG Indus., Inc. v. Consumer Product Safety Comm'n.*, 593 F.2d 1323, 1328 (D.C.Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979). Thus, the term "consumer product" encompasses products, such as these refuse bins, if the products' distribution results in a significant number of consumers being exposed to the hazard associated with the product. *See Kaiser Alum. & Chem. Corp. v. Consumer Product*

---

jurisdiction of which such consumer product is found. Proceedings in cases instituted under the authority of this subsection shall conform as nearly as possible to proceedings in rem in admiralty. Whenever such proceedings involving substantially similar consumer products are pending in courts of two or more judicial districts they shall be consolidated for trial by order of any such court upon application reasonably made by any party in interest upon notice to all other parties in interest.

6. Section 3(a)(1)(ii) of the Consumer Product Safety Act defines "consumer product", with exceptions not relevant here, as "any article, or component part thereof, produced or distributed . . . (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise . . .". 15 U.S.C. § 2052(a)(1)(ii).

*Safety Comm'n.*, 574 F.2d 178, 181 (3d Cir.), *cert. denied*, 439 U.S. 881, 99 S.Ct. 218, 58 L.Ed.2d 193 (1978). *See also Consumer Product Safety Comm'n. v. Anaconda Co.*, 593 F.2d 1314, 1320 (D.C.Cir.1979); *D. D. Bean & Sons Co. v. Consumer Product Safety Comm'n.*, 574 F.2d 643 (1st Cir. 1978).

■ The undisputed facts of this case amply support a finding that these refuse bins were "consumer products" within the intent of the statute. Two of the bins were located in the parking area of apartment complexes where many "consumers," especially small children, were exposed to the precise hazard presented by these refuse bins. The remaining three bins were located in the parking areas of a retail business, a drive-in restaurant and a supermarket. In each of these instances use of the facility by consumers is actively facilitated and encouraged. It is undisputed that access to all five of these refuse bins was unrestricted. Surveys done by the Commission indicate that such refuse bins are typically located at establishments such as those involved in the present cases. Affidavit of Patricia A. Royer at ¶¶ 3–6 (July 31, 1979) and exhibits annexed thereto.[7] From this material it is a reasonable, if not necessary, inference that the injuries and deaths which prompted enactment of this regulation occurred in locations similar to those involved in the present cases. Therefore, in the circumstances of this case, the refuse bins are "consumer products" within the meaning of the statute and the third element of the banning regulation is satisfied.

Claimants have limited their substantive contentions to the last element of the banning regulation, *i. e.* it is contended that these particular refuse bins were not "in commerce or being distributed in commerce on or after the effective date" of the ban within the intent of the regulation. The claimants base this argument on the following undisputed facts.

As noted above, claimants are in the solid waste disposal business. With respect to most of their customers, including the five locations involved in these cases, the refuse bin was supplied by the claimants as part of the service provided, *i. e.* the periodic collection of solid waste. Provision and maintenance of the refuse bin is subsumed within the total charge made for this service. Thus, the charges for the claimants' services are somewhat less if the customer provides his own refuse bin. Deposition of Mark L. Mauriello at 33–35; Deposition of Michael Bernard Grillo at 32–35. However, no separate charge is made for the refuse bin, nor is the bin subject to a rental or lease agreement with the customer. Answers to Interrogatories of Metro Disposal Corp., # 10(a); Answers to Interrogatories of Mauriello Disposal, Inc., # 10(b). Of course, ownership of the bins is admitted by the claimants. It is undisputed that each of the five bins had been placed at its respective location well before the effective date of the regulation. Answers to Interrogatories of Metro Disposal Corp., # 4(d); Answers to Interrogatories of Mauriello Disposal, Inc., # 4(d). Although claimants remove the refuse bins from their locations for the purpose of maintenance, these five bins apparently were not removed between the effective date of the ban (June 13, 1978) and their seizure in December 1978 and January 1979.

Claimants argue that the Commission recognized that a large number of refuse bins would already be in service on the effective date of the regulations and further recognized that such bins had a relatively long useful life. However, claimants contend that, rather than make the ban applicable to all such bins, the Commission defined "in commerce and being distributed in commerce" to include only certain defined types of transactions whereby these refuse bins would be accessible to consumers.

In describing the ban on unstable refuse bins the Commission commented,

---

7. Of the over 100 refuse bins observed, 39 were located at apartment complexes or motels, 34 at retail stores, 11 at recreation areas and 9 were located at restaurants. Affidavit of Patricia A. Royer, ¶ 6 (July 31, 1979).

Among unstable refuse bins now distributed in commerce are newly manufactured refuse bins, that are in the possession of the manufacturer or in the marketing chain, and bins that are the subject of rental or lease agreements between bin owners and persons who make such bins available for consumer use. The Commission considers that each rental or lease of an unstable refuse bin in such circumstances is a "distribution in commerce" as that term is used in the [Act].

42 Fed.Reg. 30295, 30296 (June 13, 1977). With respect to the jurisdictional scope of the ban, the Commission stated that the regulation

applied to those refuse bins being distributed in commerce on or after the effective date of the rule which do not meet the criteria of [the regulations] and which are produced or distributed for sale to or for the personal use, consumption or enjoyment of consumers, in or around a permanent or temporary residence, a school, in recreation or otherwise. Further, since rental or lease of a bin is considered to be a "distribution in commerce," the proposal was intended to cover those refuse bins subject to the ban which are rented or leased and are available for use by the public.

*Id.*

Further information in this regard is provided by the Commission's response to a comment regarding the scope of the ban:

Section 8 of the [Act] provides that a ban applies to a product that "is being or will be distributed in commerce." Thus, the banning rule would apply to a covered product that "is being * * * distributed in commerce" on the effective date of the rule and/or "will be distributed in commerce" after the effective date of the rule. Examples of refuse bins distributed in commerce are those that are newly manufactured, those that are in the marketing chain, and also rented or leased refuse bins that are available for use by consumers.

*Id.* An additional comment questioned whether rental transactions were within the scope of the Commission's jurisdiction under the statute. The Commission responded:

Under the [Act] . . ., the Commission believes that, . . . rental transactions may be covered by consumer product safety rules. As discussed in the preamble to the Commission's proposal, the statutory definition of "distribution in commerce" at section 3(a)(11) of the [Act] includes a variety of transactions under the umbrella of "distribution." Examples of the types of transactions coming under this umbrella are a sale in commerce, an introduction into commerce, a delivery for introduction into commerce, a holding for sale after introduction into commerce, and a holding for distribution after introduction into commerce. Rentals, although not specifically mentioned in the definition, fit into several of the enumerated transactions.

The definition of "commerce" at section 3(a)(12) of the [Act] is broad in that it includes transactions which "affect" trade, traffic, commerce, or transportation between a place in a state and any place outside thereof. Of great importance here is that the legislative history of this section states specifically that Congress intends the definition to cover transactions in intrastate commerce as well.

Therefore, the Commission considers that each rental transaction between an owner of a refuse bin and a person who makes the bin available for consumer use is a "distribution in commerce" under the [Act].

*Id.* at 30297. Finally, in response to an inquiry as to why a ban, rather than a safety standard enforced pursuant to § 15 of the Act, 15 U.S.C. § 2064, was necessary, the Commission stated,

In evaluating the extent of the hazard from unstable refuse bins, the Commission found that refuse bins are used for many years before being discarded. Estimates of their useful life range from 10 to 15 years. Although other products which may be hazardous may also have a

long life in the hands of individual consumers, a substantial number of refuse bins are rented and therefore they remain in commerce and are constantly available for use by large numbers of consumers. As discussed previously in section B of the preamble, rental transactions are, "distributions in commerce" under the [Act] and therefore bins that are rented or leased remain in commerce and would be subject to a ban under section 8.

The combination of the long life of refuse bins plus the fact that they could remain in commerce and be available for use by many people, persuaded the Commission that no feasible consumer product safety standard under the [Act] could adequately protect the public from the unreasonable risk of injury associated with unstable refuse bins used by consumers. As provided by section 9(d)(1) of the [Act], a standard "shall be applicable only to consumer products manufactured after the effective date" of a rule. A ban on the other hand, can apply to products being distributed in commerce on the specified effective date of the consumer product safety rule.

*Id.*

· Much of this analysis was incorporated into the regulations themselves. The Commission specifically incorporated the findings concerning the extended useful life of such refuse bins and noted that "a substantial number of unstable refuse bins remain in commerce because they are rented or leased and are constantly available for use by large numbers of consumers." 16 C.F.R. § 1301.3(e)(3). Accordingly, rental or lease transactions were specifically included as "distributions in commerce" within the scope of the ban and the owners or lessors,

rather than their customers, were "considered to be distributors." 16 C.F.R. § 1301.1(c).

Based upon these materials claimants contend that, with respect to those refuse bins already distributed on the effective date of the regulation, *only* those bins subject to rental or lease agreements are within the scope of the ban. Since the refuse bins at issue in these cases were on location prior to the regulation's effective date and were not subject to a rental or lease agreement with the customer, claimants argue that the bins are outside the scope of the regulation. For the following reasons I cannot agree.

Section 8 of the Act specifically contemplates that a ban promulgated by the Commission apply to products that "[are] being, or will be, distributed in commerce." It is apparent from a reading of the commentary published by the Commission that this language has been relied upon to extend the ban to rental or lease transactions. Because of the characteristics of these particular articles, such as their extended useful life and the frequency in the industry of rental or lease arrangements, the Commission apparently felt that the ban would be ineffective unless extended to rental or lease arrangements. Comments directed to the Commission questioned whether extension to this type of arrangement was within the Commission's jurisdiction. Nowhere do I find a suggestion that specific mention of rental agreements was intended to limit the ban to that particular type of arrangement. If anything, the specific mention of rental/lease arrangements was intended as a clarification of the broad scope of the ban, rather than as a limitation of its applicability.[8]

8. Further support for the interpretation of the regulation as an expansion with regard to rental or lease transactions is contained in the material published by the Commission when the ban was first announced:

By virtue of the definition of the terms "distribute" and "commerce" in sections 3(a)(11) and (12) of the [Act] (15 U.S.C. 2052(a)(11) and (12) the Commission has jurisdiction over consumer products which, among other things, are manufactured or offered for sale

or distributed, directly into or in a manner otherwise affecting, interstate commerce. More specifically, "distribution in commerce" may include not only the sale, delivery for or the introduction, into interstate commerce, but the holding for sale or distribution *after* introduction, into commerce.

Based on this definition of "distribution in commerce" which indicates that "distribution" is not limited to sales, it is the Commission's intention that the scope of this pro-

■ As with the definition of "consumer product," such examples given by the Commission of the type of transactions covered by the ban must be construed to assure comprehensiveness rather than as a limitation to the specific transactions in the example. *See ASG Indus., Inc. v. Consumer Product Safety Comm'n.*, 593 F.2d at 1328; *Consumer Product Safety Comm'n. v. Anaconda Co.*, 593 F.2d at 1320. The particular form of the transaction by which a product is distributed cannot be determinative of whether a product is within the statutory or, for that matter, regulatory definition. *See Kaiser Alum. & Chem. Co. v. Consumer Product Safety Comm'n.*, 574 F.2d at 181 (construing definition of consumer product and exclusions contained in the Act). Any other analysis would be an exaltation of form over substance. A child can quite as easily be killed or seriously injured by an unstable refuse bin paid for as part of a total service fee as by one rented or leased from a refuse collection service.

Further indication that this interpretation is mandated lies in the expansive interpretation of the concepts of "commerce," "distribution in commerce," and "to distribute in commerce," contained in the Act. *See* 15 U.S.C. § 2052(a)(11), (12).[9] The legislative history makes it clear that purely intrastate transactions "affecting" commerce are considered to be within the ambit of the Act. House Conference Rep. No. 1593, *reprinted at* [1972] U.S. Code Cong. & Admin. News pp. 4573, 4634–35; H.R.Rep. No. 92–1153, 92d Cong., 2d Sess., pp. 26–27 (1972); 42 Fed.Reg. 30295, 30297 (June 13, 1977). The House Committee on Interstate and Foreign Commerce noted:

> The Committee's decision to extend the reach of this bill to hazards associated

with products the distribution or use which "affects" commerce has two bases: First that effective enforcement of consumer product safety would be impracticable if the standards applied only to products in interstate commerce; and second, that the very substantial economic effects of accidents involving consumer products are sufficient to justify Federal intervention without regard to whether the particular product crosses state lines. H.R.Rep. No. 92–1153, 92d Cong., 2d Sess., pp. 26–27 (1972).

■ Factors such as those emphasized by claimants (*e. g.* refuse bins having been placed on location prior to the ban) might have had some significance had Congress limited applicability of the Act to articles "in commerce." Leaving aside conceptual niceties, however, distinctions as to when a transaction in interstate commerce begins and ends are largely inapplicable when the scope of the Congressional enactment is defined to include transactions "affecting commerce." *See Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *J. P. Mascaro & Sons, Inc. v. Wm. J. O'Hara, Inc.*, 565 F.2d 264 (3d Cir. 1977).

■ Additionally, remedial legislation such as this must be liberally construed in order to effectuate its purpose, *i. e.* the protection of the public from injury due to hazardous products. *Consumer Product Safety Comm'n. v. Chance Mfg. Co.*, 441 F.Supp. at 231. *See generally, United States v. An Article of Drug . . . Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969). Finally, the construction given a regulation by the agency charged with the regulation's enforcement, such as the Commission, is enti-

posed ban will extend not only to the sale of those refuse bins declared to be banned hazardous products but also to those banned bins which are the subject of a rental or lease transaction.
42 Fed.Reg. 1484 (Jan. 7, 1977). (Emphasis in original.)

**9.** "Commerce" is defined in § 3(a)(12) of the Act, 15 U.S.C. § 2052(a)(12) as "trade, traffic, commerce, or transportation—(A) between a

place in a State and any place outside thereof, or (B) which affects trade, traffic, commerce, or transportation described in subparagraph (A)." In § 3(a)(11) of the Act, 15 U.S.C. § 2052(a)(11), the terms "to distribute in commerce" and "distribution in commerce" are defined to mean "to sell in commerce, to introduce or deliver for introduction into commerce, or to hold for sale or distribution after introduction into commerce."

tled to a certain amount of deference. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Taken together the above factors and principles are sufficient to convince me that this banning regulation applies to the refuse bins seized in these cases. Under the facts and circumstances detailed above, these refuse bins were "distributed in commerce or being distributed in commerce" by the claimants on the effective date of the regulation. I lay particular emphasis on the undisputed fact that these refuse bins do not meet the standards of the regulation and, therefore, present a danger to the lives of "consumers," especially children. In such circumstances, I will adopt the construction of the statute and regulations in closer conformity with the effectuation of the Act's stated purpose, the protection of such "consumers."

There being no genuine issue of material fact, summary judgment is granted in favor of the United States condemning and forfeiting the refuse bins seized in these cases as banned hazardous products under the Consumer Product Safety Act.