ASG INDUSTRIES, INC. et
al., Petitioners,

v.

CONSUMER PRODUCT SAFETY
COMMISSION, Respondent.

FLAT GLASS ASSOCIATION OF
JAPAN et al., Petitioners,

v.

CONSUMER PRODUCT SAFETY
COMMISSION, Respondent.

Nos. 77–1216, 77–1238.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 5, 1978.

Decided Jan. 31, 1979.

As Amended Feb. 6, 1979.

Eugene L. Stewart, Washington, D. C., for petitioners in No. 77–1216.

Kim D. Mann, Washington, D. C., for petitioners in No. 77–1238.

Benjamin P. Schoen, Atty., Dept. of Justice and Alan H. Schoem, Atty., Consumer Product Safety Commission, Washington, D. C., with whom Charles R. McConachie and Edward B. Craig, IV, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondent.

Before BAZELON, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

In this case we consider a petition by manufacturers of wired glass to review the Safety Standard for Architectural Glazing Materials [1] promulgated by the Consumer Product Safety Commission ("CPSC" or the "Commission") pursuant to section 7 of the Consumer Product Safety Act ("CPSA" or the "Act").[2] They assert jurisdictional and substantive challenges to the validity of the safety standard as applied to their product, but their petition does not claim any procedural infirmity in the safety rule, which

---

1. 16 C.F.R. § 1201 (1978).

2. Pub.L.No.92–573, 86 Stat. 1207 (1972), *as amended by* Pub.L.No.94–284, 90 Stat. 503 (1976) (codified at 15 U.S.C. §§ 2051–81 (1976)). CPSA § 7(a)(1), 15 U.S.C. § 2056(a)(1) (1976), provides:

> The Commission may by rule, in accordance with this section and section 2058 of this title, promulgate consumer product safety standards. A consumer product safety standard shall consist of one or more of any of the following types of requirements:
>
> (A) Requirements as to performance, composition, contents, design, construction, finish, or packaging of a consumer product.

> (B) Requirements that a consumer product be marked with or accompanied by clear and adequate warnings or instructions, or requirements respecting the form of warnings or instructions.
>
> Any requirement of such a standard shall be *reasonably necessary to prevent or reduce an* unreasonable risk of injury associated with such product. The requirements of such a standard (other than requirements relating to labeling, warnings, or instructions) shall, whenever feasible, be expressed in terms of performance requirements.

was issued after extensive comment and consultation.[3]

## I. BACKGROUND

The safety standard prescribes impact-performance requirements that must be met by glazing materials[4] intended for use in any of the following architectural products: doors, including storm doors, combination doors, and patio-type sliding glass doors; bathtub or shower doors and enclosures; and glazed panels.[5] Section 1201.2 of the standard divides affected products into two categories.[6] "Category II products" are those that contain at least one piece of glazing material that exceeds 9 square feet in surface area, as well as all shower or bathtub enclosures and all patio-type sliding glass doors. The performance standard requires that glazing materials for use in Category II products, when subjected to an impact of 400 foot-pounds of kinetic energy delivered by a test apparatus described in the standard, must either not break, or break with one of several acceptable breakage characteristics. All other products subject to the standard are "Category I products," and need only survive impacts of 150 foot-pounds of kinetic energy.[7]

Subsection 1201.1(c) provides special exemptions for various products.[8] One is temporary. It suspends until January 6, 1980, application of the standard to "[w]ired

3. Review of a safety standard by this court is authorized by CPSA § 11, 15 U.S.C. § 2060 (1976). The administrative process was initiated in June, 1973, when the Consumer Safety Glazing Committee ("CSGC"), an ad-hoc group of industry, labor and general interest organizations, petitioned the Commission under CPSA § 10 to commence a proceeding for the development of a consumer product safety standard designed to address the hazards associated with architectural glass. In November of that year the Commission granted CSGC's petition on the basis of information submitted by that group, consideration of injury data reported by the National Electronic Injury Surveillance System, and review of data and information gathered by the National Commission on Product Safety. In May, 1974, pursuant to CPSA § 7, 15 U.S.C. § 2056 (1976), the Commission published a notice of proposed rulemaking and solicited offers to formulate a consumer product safety standard as required by the Act. 39 Fed.Reg. 18502 (1974). Four offers were received and two existing voluntary standards were submitted. In August, 1974, the Commission announced its acceptance of CSGC's offer to develop a standard to encompass architectural glazing materials. 39 Fed.Reg. 30191 (1974). In February, 1976, the Commission published the proposed standard for public comment. 41 Fed.Reg. 6178 (1976). In January of 1977, the consumer product safety standard involved in this case was promulgated, 42 Fed.Reg. 1441 (1977). It was amended in June and December of that year, 42 Fed.Reg. 31166, 61860 (1977).

4. 16 C.F.R. § 1201.2(a)(11) (1978) provides:

"Glazing material" means plastics, glass, including annealed glass, organic-coated glass, tempered glass, laminated glass, wired glass; or combinations thereof where these are used:

(i) In openings through the architectural products listed in § 1201.1(a), or

(ii) As the architectural products themselves, e. g., glazed panels or unframed doors.

5. 16 C.F.R. § 1201.1(a) (1978). The standard also prescribes environmental durability requirements, from which wired glass is exempted (§ 1201.4, table 1), as well as labeling requirements, which are not material to this case.

6. 16 C.F.R. § 1201.2(a)(3), (4) (1978). The classification is based on "the expectation of whether in normal use or during reasonably foreseeable misuse [the products] will be subjected to high energy or low energy impact and whether it is likely that an individual's full body will be involved in the impact." 42 Fed. Reg. 1429 (1977).

7. See 16 C.F.R. § 1201.4(e)(1) (1978); 42 Fed. Reg. 1434 (1977).

8. The following products, materials, and uses are exempted by the subsection:

(1) Wired glass used in doors or other assemblies to retard the passage of fire, where such door or assembly is required by a federal, state, local or municipal fire ordinance, except that this exemption shall terminate on January 6, 1980.

(2) Louvers of jalousie doors;

(3) Openings in doors through which a 3 inch diameter sphere is unable to pass;

(4) Leaded glass panels where no individual piece of glass has an area greater than 30 square inches;

(5) Glazing materials used as curved glazed panels in revolving doors;

(6) Commercial refrigerated cabinet glazed doors.

16 C.F.R. § 1201.1(c) (1978).

glass used in doors or other assemblies to retard the passage of fire, where such door or assembly is required by a federal, state, local or municipal fire ordinance." [9] Although one type of glazing material is often an acceptable substitute for another,[10] wired glass used in fire doors and other fire-retardant barriers seems to be an exception. Petitioners submit, apparently without contest, that wired glass is the only transparent construction material that neither shatters, ignites nor produces dangerous fumes when exposed to the extreme temperatures produced by a major fire. The visibility afforded by the material allegedly offers advantages to both firefighters and persons seeking escape from a fire. Thus it is preferred to opaque construction materials and commonly is required by statute for such uses.[11] The Commission conceded when the safety standard was issued that neither wired glass nor an acceptable substitute could then be produced that would both exhibit the fire-retardant characteristics required by fire codes and satisfy the safety standard; but the Commission expressed confidence that the necessary technology could be developed during the deferral period, *i. e.,* between the 1977 issuance and January 6, 1980.[12] Petitioners object to the application of the standard to wired glass intended for any use, but assert a particular objection to the application of the standard to wired glass used in fire doors and other fire-retardant barriers.

## II. DEFINITION OF "CONSUMER PRODUCT"

The Commission's jurisdiction to promulgate consumer product safety standards, though comprehensive in certain respects, is circumscribed by the Act's complex definition of "consumer product." Petitioners argue that architectural glazing materials, and in particular wired glass, belong to a category of construction materials that are not encompassed by the definition, and thus fall outside the Commission's jurisdiction.[13]

In *CPSC v. Anaconda Co.,* 193 U.S.App. D.C. ——, 593 F.2d 1314 (1979), decided this day, we examined the scope of the term "consumer product." The statutory definition provides in part: [14]

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does *not* include—
>
> (A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer.

A consumer product may be "any article, or component part thereof." The term "article" was intended to refer to a distinct article of commerce, as opposed to any physical entity that might exist at an intermediate stage of production. *Anaconda, supra,* at —— – ——, 593 F.2d at 1314–1322. The reason for the phrase "or component part thereof" was to enable the Commission to regulate just a part of a consumer product if only such regulation were warranted.[15] Thus a product may

---

**9.** 16 C.F.R. § 1201.1(c)(1) (1978). This deferral of the effective date for special uses of wired glass is reiterated in section 1201.7, which otherwise specifies July 6, 1977, as the effective date of the standard. 16 C.F.R. § 1201.7 (1978). Since the standard will apply to all uses of wired glass without further Commission action, all of the issues raised by petitioners are currently ripe for review.

**10.** *See* 16 C.F.R. § 1201.1(d)(3)(i) (1978).

**11.** *See* 42 Fed.Reg. 1430 (1977); ASG Industries Brief at 24–27 (quoting from various submissions to the Commission).

**12.** 42 Fed.Reg. 1430 (1977).

**13.** Brief of Flat Glass Assoc. of Japan at 10–16.

**14.** CPSA § 3(a)(1), 15 U.S.C. § 2052(a)(1) (1976).

**15.** S.Rep.No.92–835, 92d Cong., 2d Sess. 7 (1972) U.S.Code Cong. & Admin.News 1972, p.

qualify as a "consumer product" if it either is produced or distributed as a distinct article of commerce (and fulfills the other definitional requirements), or is produced or distributed as a component part of such a distinct article. *Id.* As we brought out in *Anaconda,* clauses (i) and (ii) of the definition were designed to ensure that the term "consumer product" would encompass the various modes of distribution through which consumers acquire products and are exposed to the risks of injury associated with those products—not only direct sale transactions, covered by clause (i), but also any lease, promotional gift, or purchase by an institution, for consumer use, covered by clause (ii). *Id.* at ——– – ——–, 593 F.2d at 1314–1322.

A consumer product must be used or intended for use "in or around a permanent or temporary household or residence, a school, in recreation, or otherwise." This enumeration of locations and activities in which a consumer product may be used is not a limitation on jurisdiction, but rather an assurance of comprehensiveness.[16] Other provisions of the definition exclude from the commission's jurisdiction certain uses of products that would otherwise qualify as consumer products.[17]

■ The foremost limitation on the core definition of "consumer product" specifies a requirement that the product must be "customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer." As we discussed in *Anaconda,* a product must be "customarily"—not just occasionally—produced or distributed for the use of consumers. Jurisdiction does not require a showing that a majority of product-sales are to consumers, but there must be a significant marketing of the

product as a distinct article of commerce for sale to consumers or for the use of consumers before the product may be considered as "customarily" produced or distributed in that manner. *Id.* at ——–· ——–, 593 F.2d at 1314–1322.

■ The record before the court substantiates that the products covered by the safety standard are customarily marketed as distinct articles of commerce for sale to consumers or for the use of consumers in or around a household or residence, a school, in recreation, or otherwise.[18] Thus they qualify as "consumer products."

## III. PREEMPTIVE JURISDICTION UNDER THE OCCUPATIONAL SAFETY AND HEALTH ACT

Petitioners argue that the Commission is deprived of authority over architectural glazing materials used in most non-residential buildings by the terms of CPSA § 31, which provides in part:[19]

> The Commission shall have no authority under this chapter to regulate any risk of injury associated with a consumer product if such risk could be eliminated or reduced to a sufficient extent by actions taken under the Occupational Safety and Health Act of 1970.

■ The Occupational Safety and Health Act ("OSHA")[20] assigns authority to the Secretary of Labor ("Secretary"), who has delegated administration to the Occupational Safety and Health Administration of the Department of Labor. The legislative history reveals that CPSA § 31 was not intended to preclude the exercise of jurisdiction by CPSC whenever a product-hazard either potentially could be or was in part being regulated under OSHA. Congress re-

---

4573; *Anaconda, supra,* at , 593 F.2d at 1314.

16. *See CPSC v. Chance Mfg. Co.,* 441 F.Supp. 228, 231–34 (D.D.C.1977) (the phrase "in recreation, or otherwise" does not restrict the locations where consumer products are used to residences and schools).

17. CPSA § 3(a)(1)(B)–(H), 15 U.S.C. § 2052(a)(1)(B)–(H) (1976).

18. JA at 58a–58q ("Research Report on Analysis of the Architectural Glass Field and the Potential Impact of New Standards Regulating the Use of the Product—Manufacturing and Distribution").

19. 15 U.S.C. § 2080 (1976).

20. 29 U.S.C. §§ 651–78 (1976).

quired CPSC to make a judgment. The Conference Committee Report outlined the pertinent considerations:[21]

In determining whether a risk of injury can be reduced to a sufficient extent under [OSHA], it is anticipated that the Commission will consider all aspects of the risk, together with the remedial powers available to it under . . . the bill and the remedial powers under [OSHA] available to the agency administering the law.

We find that the Commission acted reasonably in determining that the risk of injury associated with architectural glazing materials could not be reduced "to a sufficient extent" under OSHA and thus required regulation under CPSA. Due to the nature of the problem associated with architectural glazing materials—an inadequacy in the structural properties of the product—a reduction in the product-hazard sufficient for the effective protection of consumers can be achieved only by regulation of the manufacturing process. Under OSHA, which is designed to provide a safe working environment, the Secretary may not act directly against a manufacturer of an unsafe product unless that product poses a hazard to the manufacturer's employees.[22] Obviously even a safe place of manufacture, organized to protect employees fully, may

be engaged in the production of items that will be dangerous to consumers.

Petitioner Flat Glass Association objects that "[t]here are no findings" on this issue. Brief at 23. The statute does not require "findings" on this point, as it does on the subjects embraced by CPSA § 9, which specifies the procedures governing promulgation of a consumer product safety rule.[23] While Flat Glass argues that this is a matter of "jurisdiction," the statute speaks in terms of a limit on the Commission's "authority." Flat Glass states that there were "specific written public comments challenging CPSC's jurisdiction on this very point (Rec.Doc.No.705, n. 3)." *Id.* However, it has not included the cited document in the Joint Appendix, and the citation to a footnote in that document raises the question in the court's mind whether the Commission was fairly alerted that a serious question was being raised along these lines.[24] Certainly the court would be more comfortable if the Commission's determination were express and not merely implicit. But even in an adjudicatory proceeding an agency cannot reasonably be asked to dot all "i's" and cross all "t's."[25]

We have taken into account that the Secretary of Labor may have authority to reg-

---

**21.** H.R.Rep.No.92–1593, 92d Cong., 2d Sess. 38 (1972), U.S.Code Cong. & Admin.News, 1972, pp. 4573, 4630. In the Senate version of the bill (S. 3419), a product-hazard fell outside the Commission's jurisdiction if the product was "subject to safety regulations" under OSHA. The Senate Commerce Committee Report explained that this phrase referred to actual, not potential, regulation of the product. S.Rep.No. 92–749, 92d Cong., 2d Sess. 12–13 (1972). Under the House version of this provision (now CPSA § 31), even if the product is being regulated under OSHA, the Commission has authority if there has not been sufficient reduction or elimination of the risk of injury. The House approach was adopted by the Conference Committee. H.R.Rep.No.92–1593, *supra*, at 38.

We need not consider whether the Commission's authority may be negatived if there exists potential but unexercised authority under OSHA to sufficiently reduce a risk of injury within the Secretary's jurisdiction.

**22.** *See* 29 U.S.C. §§ 655(b)(1) (procedure for promulgation, modification, or revocation of standards), 651 (congressional statement of

findings and declaration of purpose and policy), 654(a) (duties of employers), 658(a) (citations; authority to issue) (1976).

**23.** 15 U.S.C. § 2058 (1976). *See* section VI *infra*.

**24.** *See Alianza Federal de Mercedes v. FCC*, 176 U.S.App.D.C. 253, 259–60, 539 F.2d 732, 738–39 (1976). We have examined the footnote cited in the Flat Glass Brief. The only reference to OSHA is in the following two sentences: "Congress never intended the Commission to regulate the safety of 'products' used in commercial or industrial establishments. Such jurisdiction was given to OSHA exclusively." Apart from the inaccuracy of the view expressed, this is hardly the kind of comment that can be expected to bring forth a well-reasoned agency response, buried as it was among thousands of pages of submissions.

**25.** *WAIT Radio v. FCC*, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969).

ulate use of architectural glazing materials in places of employment. However, assuming that the Commission's regulation were modified to remove sales to places of employment, Flat Glass does not suggest that it would be feasible for a manufacturer to establish a separate area or process to be used for glass destined for industrial or commercial use. In our view, the scope of the regulation as it stands has not been effectively impeached. If there is or should arise a matter of substance, such as a showing that differentiation of glass intended for use in places of employment is feasible at the manufacturing level, and that regulation under OSHA would sufficiently reduce the risk of injury to employees, a petition to amend would be ripe for consideration.[26]

## IV. INCLUSION OF WIRED GLASS IN A SAFETY STANDARD ENCOMPASSING ARCHITECTURAL GLAZING MATERIALS

Petitioners assert that the functional and risk characteristics of wired glass are dissimilar from those of the other glazing materials covered by the safety standard. In particular petitioners allege (A) that wired glass resists breakage when subjected to substantial impacts, and that when wired glass fractures it presents a minimal risk of injury due to the breakage characteristics of the material—producing shards with right angles as opposed to acute angles; (B) that the wire embedded in the glass increases the product's visibility, thus reducing the risk of inadvertent collision; and (C) that wired glass exhibits unique functional advantages when employed in fire doors and other assemblies designed to retard the passage of fire. Petitioners argue that these factors so differentiate wired glass from other architectural glazing materials that it is unreasonable for the product to be covered by the same safety standard. Certain aspects of this argument have merit.

 The problem requires an examination of the Commission's authority to treat a range of similar products as a single product class. Without this authority, products of nearly identical design, composition, and function, but of different manufacture or brand-name, would have to be treated individually by the Commission, which would find itself entangled in needlessly repetitive investigation, rulemaking and adjudication. On the other hand, if the Commission could consider all products with similarities of design or composition as comprising a single product class, then one safety standard might unreasonably encompass a range of products that did not present remotely similar risks of injury or serve similar functions. The concepts of function and risk are pervasive in the statutory scheme. Products may be treated as a group if they exhibit a sufficient similarity of functional and risk characteristics. The task of evaluating these factors to determine product classifications is committed primarily to the judgment of the Commission.[27] However, the Commission has a responsibility to justify application of the standard to a product or product-use that, according to the facts elicited in the course of rulemaking, exhibits significantly dissimilar functional or risk characteristics when compared with the other products covered by the standard.[28] That responsibility obtains at least where, as here, the product accounts for a significant quantum of usage. The administrative record must reflect that the Commission has determined by reasoned decision-

---

**26.** *Compare Investment Co. Institute v. Federal Reserve Board,* 179 U.S.App.D.C. 311, 322, 551 F.2d 1270, 1281 (1977).

**27.** CPSA § 9(c)(1), 15 U.S.C. § 2058(c)(1) (1976), provides in part:
(1) Prior to promulgating a consumer product safety rule, the Commission shall consider, and shall make appropriate findings for inclusion in such rule with respect to—
 * * * * * *

(B) the approximate number of consumer products, or types or classes thereof, subject to such rule;

**28.** *Bunny Bear, Inc. v. Peterson,* 473 F.2d 1002, 1006–07 (1st Cir. 1973). *See Automotive Parts & Accessories Assn., Inc. v. Boyd,* 132 U.S.App. D.C. 200, 208, 407 F.2d 330, 338–43 (1968) (agency has obligation to respond adequately to well-considered objections to proposed rule).

making either (1) that the product presents no significantly dissimilar functional or risk characteristics pertinent to the objectives of the standard; or (2) that despite significant differences, application of the standard to the product remains "reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product"— the ultimate test of a safety rule's appropriateness.[29] The Commission has engaged in this evaluation process for a number of products that have been excluded from the standard.[30] We look to the record to determine whether the inclusion of wired glass reflects reasoned decisionmaking.

### A. *Consideration of Breakage Characteristics*

Petitioners allege that wired glass resists breakage better than other glazing materials and that when wired glass fractures it presents less of a hazard than other products covered by the standard. Even if these claims are correct,[31] they do not require the exemption of wired glass from the safety standard. The Commission has determined that to avoid an unreasonable risk of injury associated with architectural glazing materials, such materials must not break, or must break with one of several acceptable breakage characteristics, when subjected to the impacts specified in the standard.[32] So long as the impact-perform-

ance standards comply with the statutory requirements,[33] it is irrelevant to judicial review whether the failure of wired glass to meet the standards is by a narrow or by a wide margin. The administrative function embraces such line-drawing even though this exercise of discretion inevitably results in some "near-misses."

### B. *Consideration of the Enhanced Visibility of Wired Glass*

Petitioners allege that the Commission has failed to evaluate as a basis for exemption the contention that the wire embedded in the glass increases the product's visibility, thus reducing the risk of inadvertent collision. The definition of one category of "glazed panels" manifests a Commission determination that the unreasonable risk of injury associated with that product-use results from the possibility that a victim will mistake a glazed panel for an open passageway. However, with respect to all other products covered by the standard—doors, bathroom enclosures, and panels that are closely associated with doors—the Commission apparently has concluded that an unreasonable risk of injury arises from collisions occurring even when the victim is aware of the presence of the barrier but the extent or the nature of the impact is unexpected due to slipping, stumbling or other mishap.[34] Enhanced visibility is obviously a

---

**29.** *See* CPSA § 7(a)(1), 15 U.S.C. § 2056(a)(1) (1976); CPSA § 9(c)(2)(A), 15 U.S.C. § 2058(c)(2)(A) (1976).

**30.** *See, e. g.,* 42 Fed.Reg. 1430 (1977) (windows and transoms); *id.* at 1431 (louvers in jalousie doors); *id.* (commercial refrigerated-cabinet doors); *id.* (garage doors); *id.* at 1431–32 (curved glazed panels of revolving doors); *id.* at 1432 (leaded glass).

**31.** There is some evidence in the record that the impact and breakage characteristics of wired glass are not superior to those of other glazing materials. For example, tested specimens of wired glass failed to survive impacts of 100 foot-pounds of kinetic energy and, when broken, produced shards with acute angles. JDA at 168, 171–75 (impact-test results for wired glass).

**32.** *See* 16 C.F.R. § 1201.4(e)(1) (1978). The Commission considered incorporating in the standard an included-angle breakage criteria

for plastics, but determined that an appropriate included-angle standard could not be formulated from the available information. 42 Fed.Reg. 1436 (1977).

**33.** CPSA § 7(a)(1), 15 U.S.C. § 2056(a)(1) (1976), specifies that each requirement of a safety standard "be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with [the consumer product(s) covered by the standard]." CPSA § 9(c)(2)(A), 15 U.S.C. § 2058(c)(2)(A) (1976), requires that the Commission make such a finding and incorporate it in the rule. CPSA § 11(c), 15 U.S.C. § 2060(c) (1976), requires that this finding be "supported by substantial evidence on the record taken as a whole." *See* discussion in section VI *infra*.

**34.** This conclusion may be gleaned from the applicability of the standard to products composed of "glazing material," defined by subsection 1201.2(a)(11) to include "glass." Glass, in

dissimilarity, but with respect to all but one product-use the characteristic is not pertinent to the risk that concerns the Commission. The standard, like the pertinent risk, applies to such products irrespective of their visual characteristics.

The visibility of a product is a critical consideration under the standard with respect to a particular category of glazed panels. We refer to subsection 1201.-2(a)(10), which defines the term. The text is somewhat complicated and appears in the margin.[35] The key point is that the Commission has made distinctions in terms of whether visual awareness of a panel will obviate the unreasonable risk of injury. The definition of glazed panel in paragraph (iii) consists of specifications that may be summarized briefly as relating to instances where the glazing material has a bottom edge close to the floor, is sufficiently large that it conceivably could be a passageway, and there is a walkway on both sides. These characteristics define a situation in real life where a person would have the impression of an open passageway before him and might be unaware that he was confronted by a solid barrier. The Commission's purpose is revealed by paragraph

(iv)(B), which excludes from the definition of glazed panel those panels described in paragraph (iii) that have "a horizontal member such as a piece of the framing or permanent chair rail" located to operate as a visual barrier. The Commission's comments accompanying the safety standard explicate its intention: [36]

PPG Industries commented on § 1201.-2(a)(10)(iv)(B) of the standard which exempts from the standard panels that have a visual barrier in the form of a horizontal member such as a piece of framing or a permanent chair rail of specified dimensions and location. PPG objected to this exemption on the grounds that this section does not provide for an adequate physical barrier.

One of the modes of injury associated with glazed panels is that of the person who walks or runs into the glazed panel because he/she fails to see the glazing and believes that the area is a passageway—an open door. The standard is designed to reduce or eliminate this mode of injury by providing for the use of a visual barrier when safety glazing is not used. Therefore, the Commission has not accepted the change recommended by PPG

---

**35.** 16 C.F.R. § 1201.2(a)(10) (1978) provides:

(10) "Glazed panel" means a glazing material used in any building listed in § 1201.1(b) that is:

(i) In residential buildings, any piece of operable or nonoperable glazing material adjacent to a door whose nearest vertical edge is within 12 inches (31 centimeters) from the door in a closed position, and whose bottom edge is below the level of the top of the door; or

(ii) In all buildings other than residential buildings, any piece of operable or nonoperable glazing material adjacent to a door whose nearest vertical edge is within 48 inches (1.2 meters) from the door in a closed position and whose bottom edge is below the level of the top of the door; or

(iii) In all buildings other than residential buildings, all panes not described in paragraph (a)(10)(ii) of this section where:

turn, is defined by subsection 1201.2(a)(9) to include opaque and translucent glass. Thus opaque and translucent—*i. e.*, fully visible—products are subject to the standard. Only subsection 1201.2(a)(10)(iv)(B) manifests an intention to exclude from the safety standard products that are highly visible.

(A) The lowest edge of the glazing material is less than 18 inches (46 centimeters) above any floor or any walking surface; and

(B) The exposed glazing material in such panel exceeds 9 square feet (0.3 square meters); and

(C) There is a walking surface on both sides, either of which is within 36 inches (92 centimeters) of such panel and the horizontal planes of such walking surfaces are within 12 inches (31 centimeters) of each other.

(iv) Not included in the definition of glazed panels are:

(A) Panels where an intervening interior permanent wall is between the door and the panel(s) described in paragraph (a)(10)(ii) of this section.

(B) Panels described in paragraph (a)(10)(iii) of this section that have a horizontal member such as a piece of the framing or permanent chair rail no less than 1½ inches (4 centimeters) in width, which is located between 24 and 36 inches (61 and 91 centimeters) above the walking surface.

**36.** 42 Fed.Reg. 1429–30 (1977).

because the Commission does not intend the horizontal member to be a physical barrier.

██ The Commission regards visual awareness as a critical factor with respect to the category of glazed panels defined in paragraph (iii). This is clear from the exclusion in paragraph (iv)(B). But the administrative record does not demonstrate that the Commission has evaluated the visual characteristics of wired glass in the context of the exclusion. Hence, we remand to the Commission for reconsideration of this matter.[37]

### C. Consideration of the Functional Advantages of Wired Glass in Fire Doors

██ We turn to petitioners' objection to the application of the standard to wired glass used in fire doors and other fire retardant barriers. For these product-uses, wired glass apparently exhibits functional characteristics unique among transparent construction materials. It allegedly does not shatter, ignite nor produce dangerous fumes when exposed to the extreme temperatures produced by a major fire. When intense heat causes a wired-glass panel to crack, the embedded wire maintains the structural integrity of the product thus retarding the spread of fire. As compared with opaque construction materials, wired glass offers important advantages. Firefighters can peer through a wired-glass panel before entering a potentially lethal enclosure. A glazed panel in a fire door enables a firefighter to gain some measure of protection behind the door while battling a fire on the other side. Such uses of wired glass also afford potentially life-saving visibility to victims of fires seeking escape from a burning structure and to their rescuers as well.

The administrative record presents a substantial showing that these product-uses of wired glass exhibit functional characteris-

tics significantly different from the other glazing materials and product-uses encompassed by the safety standard.[38] The record does not reveal a process of reasoned decisionmaking by which the Commission has concluded that these uses of wired glass should be included within the standard. We remand for reconsideration of this question.

We do not require the Commission to exempt wired glass employed in fire doors and related fire-retardant barriers. It may determine on remand (1) that this particular product-use presents no significantly dissimilar functional characteristics pertinent to the objectives of the standard; or (2) that despite significant differences, application of the standard to the product-use remains reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with the product. What we do require is reasoned decisionmaking on these matters.

The Commission's deferral of the standard's effective date does not resolve the problem. Indeed, this deferral embodies an acknowledgment of the unique functional advantages of wired glass used in fire-retardant barriers and a tacit admission that application of the standard at this time to such uses of the product is not reasonably necessary to eliminate or reduce an unreasonable risk of injury.

The underlying issue relates to the Commission's authority to employ technology-forcing standards. The Commission's basic authority to prohibit characteristics that render a product unreasonably hazardous has a technology-advancing consequence; once an external requirement is mandatory, industry will strive for cost-efficient compliance. But application of a safety rule is not dependent on technological advance; the sale of a hazardous article may be prohibited even if attainment of the required

---

**37.** We do not require the Commission to exclude from the standard wired-glass panels defined in subsection 1201.2(a)(10)(iii), but there must be consideration of the matter and reasoned decisionmaking. On remand, the Commission also would have latitude to reconsider, e. g., whether to include translucent and opaque glazed panels within the exclusion of paragraph (iv)(B). See note 34 supra.

**38.** See 42 Fed.Reg. 1430–31 (1977).

standard is not feasible because technology will not yield a safe product.[39] There is also a technology-advancing purpose in the statutory provision that requires the Commission to articulate its requirements in terms of performance "whenever feasible;" the use of performance criteria rather than specifications for composition or design gives industry freedom and motivation to develop the structures and processes that most effectively meet the safety requirements.[40]

The need of the public is a matter the Commission is directed to consider in deciding whether a safety standard is "reasonably necessary to eliminate or reduce an unreasonable risk of injury." Some hazards that may interdict a product for which there is no substantial public need may be compatible with continued production and sale of a product for which there is a substantial public need.[41]

In the case of wired glass used in fire-retardant barriers, the Commission has apparently found a public need sufficient to counterbalance the risk of injury. This explains why it did not make the standard effective forthwith.[42] The Commission stated that it did not have sufficient information to determine whether wired glass intended to retard the passage of fire and complying with the impact-performance standards was technologically feasible when the regulation was issued.[43] The regulation as issued must be appraised on the assumption that the required technology is not now available.

The Commission predicates application of new requirements for the manufacture of wired glass on the projection that there will be a sufficient technological advance during the deferral period to provide a product that both satisfies the public need for safety in case of fire (by complying with fire codes), and yet avoids unreasonable risk of injury in ordinary non-fire usage (by complying with the standard).[44] The question is the validity of a safety rule based on a technology projected for emergence in the future.

■ Certainly the government may seek technological advances. It may contract and may make grants to stimulate such advances, that are dependent on technological advances,[45] or that are dependent on the exploitation of an invention. Indeed, Congress may provide that technological advance is a condition for continuation of lawful manufacture.[46] However, the direction given by Congress to the Commission is a direction to define "unreasonable risk" in light of need and feasibility, with consideration for the avoidance of economic disruption.[47] In our view, the Commission's authority to predicate a finding of unreasonable risk on the projection of technological advance occurring in the future requires that the agency have some basis in its records and files supporting the projection as meaningful and reasonable, as contrasted with mere speculative desire. The records and files before us on this appeal are utterly devoid of such a demonstration.

■ In general, a safety standard must take effect within 180 days of publica-

**39.** *See* CPSA § 8, 15 U.S.C. § 2057 (1976) (CPSC authority to ban a hazardous product for which there is no feasible safety standard).

**40.** CPSA § 7(a)(1), 15 U.S.C. § 2056(a)(1) (1976); *see* S.Rep.No.92–749, 92nd Cong., 2d Sess. 30 (1972).

**41.** *See* CPSA § 9(c)(1)(C), 15 U.S.C. § 2058(c)(1)(C) (1976); S.Rep.No.92–749, 92nd Cong., 2d Sess. 6 (1972).

**42.** There is no indication that the Commission found an unreasonable risk of injury associated with wired glass used in fire doors and related fire-retardant barriers, but delayed the effective date of the safety rule solely to soften the economic impact on manufacturers.

**43.** 42 Fed.Reg. 1430 (1977).

**44.** *Id.*

**45.** *See* CPSA § 5(b), (c), 15 U.S.C.A. § 2054(b), (c) (1976).

**46.** *See International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615 (1973).

**47.** CPSA § 9(c)(1)(D), 15 U.S.C. § 2058(c)(1)(D) (1976).

tion.[48] The 180-day limitation may be exceeded if "the Commission finds, for good cause shown, that a later effective date is in the public interest and publishes its reasons for such finding."[49] This authority confers broad discretion on the Commission. The Commission has deferred the effective date for certain products that satisfy specified intermediate safety standards. This deferral was designed to facilitate a transition with a minimum of economic disruption to the new standard set in the interest of consumer safety.[50] In an appropriate case, an agency may defer the effective date of a regulation just as a court may defer the effective date of a decree enjoining a nuisance,[51] provided there is justification. However, the requirement of reasoned decisionmaking has vitality as to such deferral measures.[52] Where, as here, the reasoning rests on a major premise of technological advance, the agency must either have support for that premise or establish a procedure that may be invoked, in the event the projection does not materialize, without disaster to the manufacturers who in good faith seek advance yet are unsuccessful. An ultimate result that sale of an item will be prohibited if there has been no technological advance must rest on an unconditioned, outright determination of unreasonable risk of injury.

The Commission may have been intending some kind of further consideration when the deferral period neared its conclusion. Taking the record as it stands, we deem it appropriate to suspend application of the safety standard to uses of wired glass required by fire ordinances, and to remand to the Commission for further consideration and explication.[53]

## V. THE STANDARD'S FAILURE TO SPECIFY A MANUFACTURER'S TESTING PROGRAM

CPSA § 14 provides for product certification and labeling. Each manufacturer of a product that is subject to a safety standard must:[54]

issue a certificate which shall certify that such product conforms to all applicable consumer product safety standards, and shall specify any standard which is applicable. . . . [Any such certificate] shall be based on a test of each product or upon a reasonable testing program.

The safety standard for architectural glazing materials specifies the tests that must be satisfied, but does not prescribe a testing program to be followed by manufacturers. Petitioners argue that this omission renders the standard as a whole impermissibly vague. We disagree.

■ Each product subject to the safety standard must satisfy its requirements.[55]

**48.** CPSA § 9(d), 15 U.S.C. § 2058(d) (1976).

**49.** *Id.*

**50.** 16 C.F.R. § 1201.7(b), (c) (1978); *see* 42 Fed.Reg. 31164–66 (1977). *See* note 42 *supra.*

**51.** *Reserve Mining Co. v. EPA*, 514 F.2d 492 (8th Cir. 1975).

**52.** *Environmental Defense Fund, Inc. v. EPA,* 179 U.S.App.D.C. 43, 57, 548 F.2d 998, 1012 (1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977).

**53.** The Commission would also have latitude to provide for other exemptions. *E. g.:* (a) Expanding the implicit exemption from the impact-performance standards for panels of wired glass through which a three-inch-diameter sphere will not pass. *See* 16 C.F.R. § 1201.-4(e)(1)(i) (1978). The Commission has determined that such a small opening does not present an unreasonable risk of injury. 42 Fed.

Reg. 1431 (1977). Upon reconsideration, the Commission may conclude that somewhat larger panels of wired glass will provide the functional advantages of that product as a fire retardant material without an unreasonable risk of injury. (b) The Commission's finding that approximately one-half of all injuries occur to small children aged 14 and under, 16 C.F.R. § 1201.1(d)(1)(iii) (1978), presents the possibility of significant reduction of risk through specification of a minimum height for wired-glass panels in fire doors.

**54.** CPSA § 14(a)(1), 15 U.S.C. § 2063(a)(1) (1976).

**55.** 16 C.F.R. § 1201.3(a) (1978), provides:

All glazing materials to which this standard applies . . . shall meet the impact and environmental test requirements [of the standard].

Manufacturers have the responsibility under CPSA § 14 to develop a reasonable testing program or to test each product to ensure compliance. Petitioners do not claim that the detailed requirements of the safety standard are vague or ambiguous. The Commission has discretion to prescribe a manufacturers' testing program.[56] However, manufacturers cannot complain that the Commission's willingness to accept their compliance in reasonable good faith automatically renders the safety standard impermissibly vague.

## VI. THE FINDINGS REQUIRED BY CPSA § 9(c)

 CPSA § 9(c), set out in the margin, requires that the Commission establish a predicate of factual determinations before promulgation of a consumer product safety rule.[57] Subsection 11(c) of the Act specifies that a safety standard may not be validated on judicial review unless the court finds that each of the subsection 9(c) determinations is "supported by substantial evidence on the record taken as a whole."[58] In considering the petitioners' arguments, we have adverted to the substance of the findings required by subsection 9(c)—evaluation of the risk of injury, definition of the relevant product classes, consideration of the public need for the product, avoidance of unnecessary economic disruption, and the conclusion that the safety rule is reasonably necessary to eliminate or reduce an unreasonable risk of injury and is in the public interest. A fair reading of the petition challenging application of the safety standard to wired-glass products reveals that there is no serious challenge to the evidentiary support for the rule with respect to product-uses for which wired glass exhibits no significant dissimilarity of function or risk when compared to other affected products. The major thrust of petitioners' arguments is that the Commission must particularize the findings required by CPSA § 9(c) for each product-use of wired glass. As we have indicated, however, no particularized findings are required to the extent that wired-glass products are properly included in the product class that encompasses other glazing materials. It would be premature to evaluate the record support for application of the safety rule to those wired-glass products that are the subject of our remand. But with respect to the product-uses not governed by the remand, we have examined the administrative record and

---

**56.** *See* CPSA § 14(b), 15 U.S.C. § 2063(b) (1976).

**57.** CPSA § 9(c), 15 U.S.C. § 2058(c) (1976), provides:

(c) Findings for inclusion in rules; required findings

(1) Prior to promulgating a consumer product safety rule, the Commission shall consider, and shall make appropriate findings for inclusion in such rule with respect to—

(A) the degree and nature of the risk of injury the rule is designed to eliminate or reduce;

(B) the approximate number of consumer products, or types or classes thereof, subject to such rule;

(C) the need of the public for the consumer products subject to such rule, and the probable effect of such rule upon the utility, cost, or availability of such products to meet such need; and

(D) any means of achieving the objective of the order while minimizing adverse effects on competition or disruption or dislocation of manufacturing and other commercial practices consistent with the public health and safety.

(2) The Commission shall not promulgate a consumer product safety rule unless it finds (and includes such finding in the rule)—

(A) that the rule (including its effective date) is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product;

(B) that the promulgation of the rule is in the public interest; and

(C) in the case of a rule declaring the product a banned hazardous product, that no feasible consumer product safety standard under this chapter would adequately protect the public from the unreasonable risk of injury associated with such product.

**58.** 15 U.S.C. § 2060(c) (1976). *See Aqua Slide 'N' Dive v. CPSC,* 569 F.2d 831, 837–38 (5th Cir. 1978) (discussing in detail the considerations relevant to application of the substantial-evidence standard to the legislative-type record of a CPSC rulemaking proceeding); *see also D. D. Bean & Sons Co. v. CPSC,* 574 F.2d 643 (1st Cir. 1978).

find that there is substantial evidence for each of the findings required by CPSA § 9(c).[59]

We conclude with discussion of the contention that, given the existing and foreseeable state of technology in the wired-glass industry, either the product will be unable to comply with the safety standard or compliance will result in an uncompetitive price. Thus, it is alleged that to the extent wired-glass products become subject to the safety rule, economic realities will result in the industry's destruction and that such a result would render the safety standard unreasonable. We deem it appropriate to consider this contention, for to the extent that it is held to be valid it bears on the remand proceeding. We find that a severe impact on the industry would be a relevant factor but would not be conclusive.

■ One of the primary motivations for the enactment of CPSA was the perceived failure of the market mechanism to reflect adequately the costs of injuries associated with consumer products and thus provide the incentive necessary if industry were to improve product safety without government regulation.[60] In economic parlance, manufacturers and distributors were externalizing some of the social costs associated with consumer products, a toll in physical injury and human suffering that was only imperfectly recompensed by the payments associated with existing tort law and insurance. One of the principal functions of CPSA is to promulgate safety rules that have the effect of compelling the internalization of these costs to the extent required to meet performance and other safety standards. Internalization of costs previously disregarded by manufacturers will likely result in a rise in cost and price, and may constrict or eliminate the demand for a particular product as consumers substitute products that offer the desired utility at the lowest price. Such an outcome would not be contrary to the intent of Congress so long as the agency has given reasoned consideration to all the pertinent factors and has made the requisite findings supported by substantial evidence. A severe economic impact on an industry, or on a significant segment of an industry, would be a material factor in appraising the reasonableness of a rule, but it cannot, in and of itself, be held to render a safety rule unreasonable.

*Affirmed in part; remanded in part for further consideration.*

---

**59.** *See* JA at 65–77m ("Hazard Analysis: Injuries Involving Architectural Glass"); JDA at 36–63 ("Analysis of the Architectural Glass Field and the Potential Impact of New Standards Regulating the Use of the Product"); *id.* at 283–93 (memorandum of Robert Kurtz regarding the *estimated distribution of glazing materials* for various types of products within the standard); *id.* at 427–506 ("Final Report: Economic and Environmental Subcommittee of the Architectural Glass Project Consumer Safety Glazing Committee"); *id.* at 216–34 ("Brief Profile and Preliminary Economic Impact Analysis on Wire Glass and Plastic Glazing"); *id.* at 321–22 ("Probable Effect of the Standard on the Utility and Availability of the Products and the Need of the Public for the Products Subject to the Standard"); *id.* at 312–13, 384–85 ("Probable Effects of the Standard on Cost to Consumers"); *id.* at 36–63, 85–159, 216–34, 332–55 (analyses of economic impact by Battelle Columbus Laboratories); *id.* at 305–22, 377–96 (economic impact analysis by the Commission's Bureau of Economic Analysis); *id. at* 427–506, 516–40 (economic information compiled by the Consumer Safety Glazing Committee); JA at 141, 142–45, 332 (support for technical findings on which the standard's performance requirements were based); JDA at 203, 206–07, 208–14, 508–15 (same).

**60.** S.Rep.No.92–749, 92d Cong., 2d Sess. 2–5 (1972).