645 F.2d 26
 ROBERT K. BELL ENTERPRISES, INC., an Oklahoma corporation,
Plaintiff-Appellant,
v.
CONSUMER PRODUCT SAFETY COMMISSION, a Commission of the
United States Government; Susan King, Chairman of the
Consumer Product Safety Commission; Frank B. Pipkin, Chief
of the Hazard Correction Branch of the Product Defect
Correction Division of the Consumer Product Safety
Commission, Defendants-Appellees.
 No. 80-1382.
 United States Court of Appeals,
Tenth Circuit.
 Argued June 20, 1980.
Decided March 27, 1981.
Rehearing Denied May 11, 1981.
 
 Bradford S. Baker of Farmer & Woolsey Inc., Tulsa, Okl., for plaintiff-appellant.
 Daniel J. Conway, Atty., Dept. of Justice, Washington, D. C. (Sanford M. Litvack, Asst. Atty. Gen., and Barry Grossman, Atty., Dept. of Justice, Washington, D. C. and Andrew S. Krulwich, Gen. Counsel, Alan H. Schoem, Asst. Gen. Counsel and Mana Jennings, Atty., Consumer Product Safety Commission, Washington, D. C., with him on brief), for defendants-appellees.
 Before SETH, Chief Judge, BREITENSTEIN, Circuit Judge, and WEINSHIENK, District Judge*.
 SETH, Chief Judge.
 
 
 1
 This appeal is taken from a summary judgment for the Consumer Product Safety Commission, and the denial of a motion for summary judgment of appellant Bell Enterprises, Inc.
 
 
 2
 The basic issue on appeal is whether plaintiff's aerial tramway, used as an amusement park ride, is a "consumer product" within the meaning of the Consumer Product Safety Act, 15 U.S.C. § 2051 et seq.
 
 
 3
 After an accident involving an amusement park tramway in Texas, the Commission began an investigation of such rides. The "Skyride" here concerned is an aerial cable tram of a type in general use in amusement parks. The Commission sent a letter to Bell Enterprises in Tulsa, Oklahoma, requesting information on the Skyride it was operating in its amusement park. This letter asked a series of questions concerning the business of Bell Enterprises and suggested that a failure to provide information could subject Bell to "penalties" up to $500,000.00, and an individual could be subjected to criminal penalties. The letter so attempted to be persuasive.
 
 
 4
 Bell Enterprises thereafter filed this suit seeking a declaratory judgment that the Consumer Product Safety Act is unconstitutional insofar as its investigatory authority is concerned, and that the Act is inapplicable to amusement parks and amusement park rides. The Commission a few days after suit was filed issued a Special Order and Subpoena for Production of Documents. Both sides moved for summary judgment. The court held that the Skyride was a consumer product over which the Commission had jurisdiction, and that Bell's Fourth Amendment rights were not violated. Bell has taken this appeal.
 
 
 5
 On the issue whether the Skyride or similar rides are "consumer products" within the meaning of the Act, several courts have considered the problem and reached different results. See State Fair of Texas v. Consumer Products Safety Commission, 481 F.Supp. 1070 (N.D.Tex.); Consumer Product Safety Commission v. Chance Mfg. Co., 441 F.Supp. 228 (D.D.C.); Walt Disney Productions v. Consumer Product Safety Commission, No. 79-0170-LEW (Px) (C.D.Cal.).
 
 
 6
 The Act, 15 U.S.C. § 2051 et seq., was enacted after two or three years of hearings and extended investigations. The history is long even before the legislation was considered by Congress, and the consideration during formal proceedings in Congress was extensive. We cannot herein describe but very limited portions of this history and only as it concerns the definitions and exclusions.
 
 
 7
 The term "consumer product" is defined in the Act at 15 U.S.C. § 2052(a)(1) as follows:
 
 
 8
 "The term 'consumer product' means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include
 
 
 9
 "(A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer ...."
 
 
 10
 It appears from the legislative history that the (i) phrase was the original or early version and (ii) was added later when consideration was given to distribution of articles to consumers not by sale but by gift, promotional samples, etc. In view of this legislative history it appears best to consider the definition as it was originally constructed and before the concern arose that consumers might also be subjected to dangers from articles which had not been produced or distributed "for sale." Thus considering (i) above, the phrase is directed to the type or kind of articles which are produced or distributed for sale to a consumer. This is a direct, uncomplicated definition, a practical test, and of relatively easy application to the vast number of articles as to which the hearings were directed. This is where the concern was, and it is apparent why those articles were initially described as "household" items.
 
 
 11
 Then with the concern over distribution to consumers of articles as free samples, on approval, on lease, on loan, etc., the second clause (ii) was added. This was added to include distribution to consumers of the same things but without a sale, and thereby to include articles produced or distributed "for the personal use, consumption or enjoyment of a consumer." This with (i) was to cover all types of distribution.
 
 
 12
 The legislative history is clear as to the reason why (ii) was added. In the construction of the definition as a whole it must be assumed that (ii) was added for the purpose stated without an intention to enlarge the definition to include articles which were not included in (i).
 
 
 13
 Since (ii) was added to cover all manner of distribution and for this alone, we should attach no significance to the addition of the word "personal" in (ii). Thus "personal" use in (ii) is no different under this view than "to a consumer for use" in (i).
 
 
 14
 If the definition is considered as outlined above, and this would appear to be in accordance with its structure and terms and with the legislative history, there is no room for the all-inclusive coverage urged by the Commission in its complete reliance on (ii). The coverage so urged is basically that any article which the consumer enjoys is a consumer product. Instead, the meaning of the (i) phrase must be regarded as controlling, not the "enjoyment" in (ii).
 
 
 15
 In ASG Industries v. Consumer Product Safety Commission, 593 F.2d 1323 (D.C.Cir.), the product considered was glazing material used in doors. The court there rejected the Commission's position that clause (ii) had extended the (i) definition. The court said, at 1328:
 
 
 16
 "As we brought out in Anaconda, clauses (i) and (ii) of the definition were designed to ensure that the term 'consumer product' would encompass the various modes of distribution through which consumers acquire products and are exposed to the risks of injury associated with those products not only direct sale transactions, covered by clause (i), but also any lease, promotional gift, or purchase by an institution, for consumer use, covered by clause (ii)."
 
 
 17
 In considering the definition further another and separate aspect becomes significant. It should be noticed that in (i), as well as in (ii), the description changes within each phrase from one directed to place of use to how the article is used. Since this division or contrast is evident and was repeated, it is of importance. The "where" element any article produced or distributed for use "in or around a ... household, or residence," and the "how" element for use "in recreation, or otherwise," are separately stated. Thus the articles are those produced or distributed for use (ordinarily) at the places stated although they may be used elsewhere from time to time. They are articles produced (ordinarily) for the purposes or uses stated.
 
 
 18
 The definition at § 2052(a)(1) obviously required a great amount of thought, consideration, and condensation. Any analysis of it must be done with that in mind. Thus the use place and the use purpose are each stated and are repeated. Both must be met in view of the way in which the definition is constructed.
 
 
 19
 The purposes for production to identify the article appear again in the exception in the (A) subdivision. 15 U.S.C. § 2052(a)(1)(A). This exception uses a customarily produced or distributed test. This excludes articles not "customarily produced or distributed for sale to ...," and again as to items not sold, "or use or consumption by, or enjoyment of, a consumer." The exclusion repeats to a large extent, but an exclusion in a definition is a device to clarify what has been affirmatively stated. The exclusion here does add the "customarily" produced phrase which is of some significance in construing phrase (i) to clarify it, and also to exclude industrial articles. The court in Consumer Product Safety Commission v. Anaconda Co., 593 F.2d 1314 (D.C.Cir.), considered this exception clause, (a)(1)(A), and gave emphasis to the customarily produced language. The court there said, at 1322:
 
 
 20
 "Jurisdiction does not require a showing that a majority of product sales are to consumers, but there must be a significant marketing of the product as a distinct article of commerce for sale to consumers or for the use of consumers before the product may be considered as 'customarily' produced or distributed in that manner."
 
 
 21
 The "customarily" language in the exception is important and would not permit the inclusion of an article customarily sold to an industrial or commercial enterprise which had the exclusive control and possession of the article in its use. In Anaconda, the court was considering wire used for household wiring. The court held that "consumer products" are those "customarily sold or otherwise distributed to consumers," and required more than an occasional sale. The court remanded the case for a determination whether wiring systems are bought separately by consumers. This factor was considered to be of basic importance. Some of the essential portions of the legislative history of the Act are described in the Anaconda opinion, and need not be repeated here. The separately sold to consumers aspect of Anaconda we also consider to be a factor to be considered here.
 
 
 22
 The definition in 15 U.S.C. § 2052(a)(1), of course, directs the search to articles for consumers' use. This "use" reference is central to the whole Act, and it contains an implication that for the article to be used, and when used, it must ordinarily be under the control and direction of the user. The control and possession must be factors of some weight to be used in reaching a decision as to whether an article is a consumer product. The trial court in its decision that the Skyride was a consumer product placed reliance on Consumer Product Safety Commission v. Chance Mfg. Co., 441 F.Supp. 228 (D.D.C.), which also concerned an amusement park ride. The court in Chance held that use "in recreation" was a category separate from "household" use, and that the exposure to danger was an important factor to Congress. The trial court in the case before us determined that the ride was used for amusement purposes, thus in "recreation." The trial court also relied on State Fair of Texas v. Consumer Products Safety Commission, 481 F.Supp. 1070 (N.D.Tex.), hereinafter discussed. The Texas District Court in State Fair of Texas (now on appeal) held that an aerial tramway was a consumer product. The court reached this result by concluding that "(t)he ride was ... produced 'for the personal use ... or enjoyment' of consumers 'in recreation,' " and that this was sufficient. The court also held that "in recreation" did not modify the preceding phrase "in or around ... a household."
 
 
 23
 In Walt Disney Productions v. Consumer Product Safety Commission, No. 79-0170-LEW (Px) (C.D.Cal.) (now on appeal), the trial court held that a Skyride was not a consumer product. The court relied on 15 U.S.C. §§ 2066(b) and 2076(f) providing that free samples of the products be provided the Commission and that the Commission could purchase the product at cost. The court concluded that this could not possibly apply to the Skyride and the article was not within the Act.
 
 
 24
 In cases dealing with articles other than rides, the court in Kaiser Aluminum & Chemical Corp. v. Consumer Product Safety Commission, 574 F.2d 178 (3rd Cir.), considered aluminum wiring and held it was a consumer product, as it is an article produced or distributed for the personal use or enjoyment of consumers. In Southland Mower v. Consumer Product Safety Commission, 619 F.2d 499 (5th Cir.), the court held that lawn mowers are governed by CPSC safety standards if they are customarily produced or distributed for sale to, or use or consumption by, or enjoyment of a consumer. We would agree that a lawn mower is for the "use" of consumers, but whether "enjoyment" is an appropriate term would seem to require some further consideration.
 
 
 25
 The extent to which an individual might be exposed to an article or its dangers as a test suggested in some opinions would not seem to provide a test implied in the statutory definition. It appears also that such an extent test would not be usefully exclusive.
 
 
 26
 When we look at the several significant indicators in the wording of the Act, and thus to consider:
 
 
 27
 1. the contents of clause (i) separately from clause (ii), and not regarding (ii) as an expansion of (i),
 
 
 28
 2. weight to be given to the use "where" and the use "purpose" distinction,
 
 
 29
 3. the "customarily" produced as a narrowing factor derived from the exclusion (A) with the separately sold element,
 
 
 30
 4. the control-possession by use with the listed items excepted,
 
 
 31
 we must conclude that the Skyride here concerned was not a "consumer product" as defined in the Act.
 
 
 32
 The judgment of the trial court is set aside, and the case is remanded for entry of judgment on plaintiff's motion for summary judgment.
 
 WEINSHIENK, District Judge, dissenting:
 
 33
 As I am unable to concur with the majority's reading of the statute, the legislative history, or the relevant case law, I respectfully dissent.
 
 I.
 
 34
 The principal issue in this appeal is whether plaintiff's aerial tramway is a "consumer product" within the meaning of the Consumer Product Safety Act (CPSA), 15 U.S.C. § 2051 et seq. The operative language is contained in the definitional section of the statute, 15 U.S.C. § 2052(a):
 
 
 35
 (1) The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise; but such term does not include
 
 
 36
 (A) any article which is not customarily produced or distributed for sale to, or use or consumption by, or enjoyment of, a consumer ....
 
 
 37
 In order to satisfy the definition, a product must be (a) any article or component thereof; (b) produced or distributed either (i) for sale to a consumer, or (ii) "for the ... use ... of a consumer;" and (c) intended for use "in or around a permanent or temporary household or residence, a school, in recreation or otherwise." As there is no dispute that the aerial tramway is "an article" within the meaning of this section, I will limit my analysis to the other two definitional requirements.
 
 1. MODES OF DISTRIBUTION
 
 38
 I would agree that the legislative history reveals that clause (i) alone constituted the original proposed definition of "consumer product." Report of the Senate Committee on Commerce on CPSA, S.Rep.No.92-749, 92d Cong., 2d Sess. (1972), S. 3419, Section 101(1), at 42. However, in my view, the legislative history does not support the majority's conclusion that clause (ii) was added to "include distribution to consumers of the same things (as clause (i) includes) but without a sale ...." Majority opinion, p. 28 (emphasis added). In analyzing the original proposed definition, clause (i), the Senate Committee specifically indicated that it intended the definition to extend to products distributed free of charge. The Committee's report states that "(t)o qualify as a 'consumer product,' therefore, the product must be one capable of production or distribution for sale to an individual but it is not necessary that the product actually be sold." S.Rep.No.92-749 at 12.
 
 
 39
 When clause (ii) was added to the definition, the legislative intent was to expand the coverage of clause (i). The Report of the House Committee on Interstate and Foreign Commerce on CPSA, H.R.Rep.No.92-1153, 92d Cong., 2d Sess. (1972), which accompanied the modified, and ultimately adopted, version of the definition, clearly states this purpose:
 
 
 40
 Special attention should be paid to the use of the phrase: "produced or distributed for sale to * * * or for the use of * * * a consumer." It is not necessary that a product be actually sold to a consumer, but only that it be produced or distributed for his use. Thus products which are manufactured for lease and products distributed without charge (for promotional purposes or otherwise) are included within the definition and would be subject to regulation under this bill. Also, products which are primarily or exclusively sold to industrial or institutional buyers would be included within the definition of consumer product so long as they were produced or distributed for use of consumers.
 
 
 41
 Id. at 27 (emphasis and ellipsis in original). Hence, the legislators' expressed intent, in amending the definition to include clause (ii), was to extend the Act's coverage to products principally sold to "industrial or institutional buyers," so long as they were produced or distributed for use of consumers. As this second class of products is not necessarily co-extensive with the class designated by clause (i), clause (ii) cannot be read to include only products which are "produced or distributed for sale to consumers."
 
 
 42
 The House Committee's interpretation[1] of the "industrial product" exception, 15 U.S.C. § 2052(a)(1)(A), lends additional support to this analysis. According to the Committee report,
 
 
 43
 It is not intended that true "industrial products" be included within the ambit of the Product Safety Commission's authority. Thus, your committee has specifically excluded products which are not customarily produced or distributed for sale to or use of consumers. The occasional use of industrial products by consumers would not be sufficient to bring the product under the Commission's jurisdiction. The term 'customarily' should not be interpreted as intending strict adherence to a quantum test, however. Your committee is aware that some products which were initially produced or sold solely for industrial application have often become broadly used by consumers. If the manufacturer or distributor of an industrial product fosters or facilitates its sale to or use by consumers, the product may lose its claim for exclusion if a significant number of consumers are thereby exposed to hazards associated with the product.
 
 
 44
 H.R.Rep.No.92-1153 at 27 (emphasis in original). Thus, clause (ii) and the "industrial product" exception together comprise the legislators' response to the question of inclusion of quasi-consumer/quasi-industrial products under the definition of "consumer product." Methods of production or distribution were rejected as the touchstone for coverage, and instead, the functional criteria of "use of consumers" and "significant number of consumers ... exposed to hazards associated with the product" were adopted. If, as its report indicates, the House Committee intended loss of the industrial product "claim for exclusion" to result "if the manufacturer or distributor of an industrial product fosters or facilitates its sale to or use by consumers ... (and) a significant number of consumers are thereby exposed to hazards associated with the product," then, a fortiori, the exception is also inapplicable when the manufacturer or distributor of a product sells it to industrial buyers solely for the use of consumers. In this case, Bell is such an "industrial buyer" because it is engaged in the recreation industry and it purchased the Skyride from the Swiss manufacturer for the ultimate recreational use of consumers.
 
 
 45
 In my view, the court's opinion in ASG Industries v. Consumer Product Safety Commission, 593 F.2d 1323 (D.C.Cir.1979), does not constitute a rejection of the Commission's position that clause (ii) expands the coverage of clause (i). The language of the ASG opinion upon which the majority relies on page 28 of their opinion includes the statement that clause (ii) covers products purchased by an institution for consumer use. Therefore, the ASG opinion can be read to support the interpretation that clause (ii) covers some products which are not covered by clause (i).
 
 2. PLACE OR PURPOSE OF USE
 
 46
 I would also find that plaintiff's aerial tramway satisfies the second requirement for classification as a "consumer product," that is, use "in or around a permanent or temporary household or residence, a school, in recreation, or otherwise." As the Circuit Court of Appeals for the District of Columbia stated in ASG, "(t)his enumeration of locations and activities in which a consumer product may be used is not a limitation on jurisdiction, but rather an assurance of comprehensiveness." 593 F.2d at 1328. It is noteworthy that, in support of this interpretation, the court cited Consumer Product Safety Commission v. Chance Manufacturing Co., 441 F.Supp. 228, 231-234 (D.D.C.1977), for the proposition that the phrase "in recreation or otherwise" does not restrict the location where consumer products are used to residences and schools. 593 F.2d at 1328, n. 16. Because the statutory language utilizes the word "or" rather than "and," I cannot concur in the majority's view that the use place and the use purpose (i. e., home or school and "in recreation or otherwise" respectively) must both be met. Rather, I would hold that the phrase "in recreation or otherwise" establishes an independent basis for Commission jurisdiction, and that, plaintiff's aerial tramway meets this definitional criterion. See also State Fair of Texas v. Consumer Products Safety Commission, 481 F.Supp. 1070, 1077 (N.D.Tex.1979).
 
 
 47
 In conclusion, I would hold that plaintiff's aerial tramway is a "consumer product" within the meaning of 15 U.S.C. § 2052(a)(1) and that it does not fall within the exception in 15 U.S.C. § 2052(a)(1)(A).
 
 II.
 
 48
 In light of my conclusion that plaintiff's Skyride is a "consumer product" within the meaning of 15 U.S.C. § 2052, I reach the question of the constitutionality of the Act's apparent authorization of warrantless "constructive searches" and of the Commission's investigative efforts.
 
 
 49
 In Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Supreme Court held that the Fourth Amendment requires an administrative agency to obtain a warrant before entering the premises of one who refuses to consent to a warrantless entry. However, the Court also noted that, despite statutory authorization of a warrantless search, if the agency actually obtains process which satisfies the Fourth Amendment, the searches under the statute are permissible. 436 U.S. at 325, n. 23, 98 S.Ct. at 1827, n. 23. The subpoena enforcement proceedings in this case provide the same check on abuse of agency power as does an administrative search warrant. Each process affords an opportunity for judicial review before governmental invasion of one's privacy, and the standard for enforcement of the subpoena does not substantively differ from that required for the issuance of a warrant. Compare United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950), and United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 254-255, 13 L.Ed.2d 112 (1964) with Marshall v. Barlow's, Inc., 436 U.S. at 320, 98 S.Ct. at 1824 and Camara v. Municipal Court, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). Therefore, neither the Act nor the Commission's investigative efforts pursuant to it violate Bell's Fourth Amendment rights.
 
 
 50
 I would affirm the District Court's ruling that Bell lacks standing to challenge the constitutionality of the statutory provisions which authorize civil and criminal sanctions. The commission's reference, in its initial letter to Bell, to possible sanctions does not constitute a threat of imminent and immediate prosecution and hence, does not establish "real and immediate" injury or threat of injury. O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); Golden v. Zwickler, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969). Like the plaintiffs in O'Shea, Bell is asking us to "anticipate whether and when (it) will be charged with (a prohibited act) and will be made to appear (to answer the charges) ...." 414 U.S. at 497, 94 S.Ct. at 676. Because the alleged harm is too remote and speculative, Bell does not have standing to mount a constitutional attack on these statutory provisions.
 
 
 51
 For the above reasons, I would affirm the decision of the District Court.
 
 
 
 *
 Of the United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 Because S. 3419, 92d Cong., 2d Sess., did not contain this or a similar exception, the Senate Committee report does not discuss it